Rommy REVSON, Plaintiff,

v.

CINQUE & CINQUE, P.C., Defendant.

No. 97 Civ. 9236 DC.

United States District Court,
S.D. New York.

Nov. 22, 1999.

Morvillo, Abramowitz, Grand, Iason & Silverberg, P.C., By Elkan Abramowitz, Elizabeth Small, New York City, for Respondent Judd Burstein.

Marc Fernich, New York City, for Plaintiff.

Cinque & Cinque, P.C., By Robert W. Cinque, James P. Cinque, New York City, pro se.

## OPINION

CHIN, District Judge.

This case presents the question of when a lawyer crosses the line from zealously

representing a client to abusing the legal process. The Second Circuit recently observed that "determining whether a case or conduct falls beyond the pale is perhaps one of the most difficult and unenviable tasks for a court." *Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323, 340 (2d Cir.1999). Here, the conduct of Judd Burstein, Esq., counsel for plaintiff Rommy Revson, was clearly and unmistakably "beyond the pale." Burstein engaged in a pattern of offensive and overly aggressive conduct that multiplied these proceedings and caused significant harm to Robert W. Cinque, Esq., and his law firm, defendant Cinque & Cinque, P.C. (the "Firm").

Those tactics included the following:

- writing a letter to Cinque threatening to "tarnish" his reputation and subject him to the "legal equivalent of a proctology exam";
- making a sham offer to settle by setting an unreasonable deadline for Cinque to respond and then immediately filing suit even though Cinque met that deadline by indicating a desire to discuss settlement;
- publicly accusing Cinque of fraud without any concrete evidence to support the claim;
- threatening to interfere with the Firm's other clients, including (i) conducting an investigation to identify those clients, (ii) contacting one or more of the Firm's former clients, and (iii) seeking permission to send a letter to all the Firm's clients to inquire as to "experiences, good or bad," with the Firm's billing practices;
- serving overly broad subpoenas, including a subpoena for all the Firm's banking records and even a subpoena seeking records from the golf course where Cinque played golf;
- threatening to add a RICO claim;
- threatening to sue Cinque individually and to seek discovery of Cinque's personal finances;

- threatening to send a letter to the Court accusing Cinque of criminal conduct if he did not capitulate to Revson's demands;
- making good on his threat to "tarnish" Cinque's reputation by contacting a reporter some weeks before trial, explaining that Revson had sued Cinque for fraudulent billing, and giving the reporter documents as well as names of former clients;
- engaging in unfair tactics at trial, including cross-examining Cinque in an unfair manner; and
- repeatedly attacking Cinque in an offensive and demeaning fashion, including calling Cinque "a lawyer who ... has acted in a manner that shames all of us in the profession," "a disgrace to the legal profession," and an example of "why lawyers are sometimes referred to as snakes," and accusing Cinque of "engag[ing] in the type of mail fraud that has led to the criminal conviction of other attorneys," being so "desperate for money he resorted to ... extortion," and being "slimy."

Burstein's tactics turned what should have been a simple dispute between a client and her attorney over the amount of a fee into a difficult, unseemly litigation that was intended from the outset to damage Cinque's reputation.

Burstein defends his actions by arguing that he was only doing his duty, that he was only doing his best to represent Revson zealously and aggressively, and that he always acted in good faith and in an objectively reasonable manner.

I am not persuaded. A lawyer's duty to represent his client zealously does not permit him to treat his adversary or parties in an offensive and demeaning manner or to engage in a course of conduct intended to coerce a settlement through improper threats and harassment. Although a lawyer must represent his client zealously, he must do so within the bounds of the law. An attorney is a pro-

fessional and an officer of the court, not a hired gun or mercenary whose sole motivation is to win or an attack dog whose sole purpose is to destroy.

Burstein did not act within the bounds of the law here. Rather, he acted in bad faith and with reckless and utter disregard for the harm that Cinque and the Firm would suffer as a result of his "Rambo" tactics.

Consequently, sanctions will be imposed against him. For the reasons set forth below, sanctions will not be imposed against Revson, although she will be assessed costs pursuant to 28 U.S.C. § 1920.

The following constitute my findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. *Revson's Relationship with the Firm*

Revson is the inventor of the "scunci," sometimes referred to as a "scrunchy," a cloth-covered, elasticized hairband that women typically wear around ponytails. Millions of dollars worth of scuncis are sold every year, and as the patent holder, Revson is often in litigation to enforce patent and licensing rights.

In February or March of 1993, Revson was involved in an arbitration in Philadelphia with L & N Sales & Marketing, Inc. ("L & N"). She was unhappy with her then-attorneys, and replaced them with Cinque and the Firm.

By retainer agreement dated March 24, 1993 and executed by her on March 25, 1993, Revson retained the Firm to repre-

sent her as "litigation counsel" in connection with a dispute with L & N and "generally" in connection with her activities as "creative artist, inventor and patent holder." (PX 1).[1] The agreement, which was signed by Cinque, advised Revson that Cinque's "customary" hourly billing rate was $325 and that his brother, James Cinque, billed at the rate of $300 per hour. The agreement further provided:

> While we keep daily records of the time we spent [sic], in fairness to you in this matter involving the many issues which arise from the current dispute with L & N our billing will take into account not only the amount of time spent, but also the result achieved.

> Of necessity, a fair amount of duplication of attorney effort and time must take place, and I do not believe it appropriate to charge you the full rate for this. At the same time, if we are able to achieve an outstanding result or substantial benefit for you, then our billing would be adjusted accordingly following consultation with you.

(PX 1).[2]

For almost five years, Revson and Cinque enjoyed an excellent relationship. The Firm represented Revson on a number of patent and licensing matters. Revson became perhaps the Firm's most important client and over the course of nearly five years she paid the Firm almost $400,000 in fees. The Firm never raised its hourly rates and often charged Revson less than the amount of the time calculated at the usual rates; the Firm reduced its bills by some $50,000 over the course of 1996 and 1997. (Trial Tr. at

---

**1.** "PX" refers to plaintiff's trial exhibits. "DX" refers to defendant's trial exhibits.

**2.** The fee agreement was in fact a "value-added" agreement as it provided that the Firm would bill for its time at its usual hourly rates, but subject to adjustment, up or down, depending on the success of the Firm's efforts or lack thereof and other factors. Value-added agreements are agreements to agree on an adjustment, and if an agreement on an adjustment cannot be reached, then the attorney

would be entitled to a reasonable fee, the amount of which would have to be set by a court. (Trial Tr. at 303–06, 489, 492–97, 608–11). Plaintiff's expert, Professor Brickman, acknowledged that as long as the agreement was not for a set or percentage adjustment, but rather was merely an agreement to agree, it was not a contingency agreement required by DR 2–106(d) to be in writing. (*Id.* at 305–06).

467–68, 667 (Cinque testifying that he told Revson about reductions), 693–700; *see, e.g.,* DX D, PP; *but see* Trial Tr. at 246–47). On at least one occasion, after Cinque negotiated a $300,000 licensing fee for Revson, he billed her on a percentage basis—five percent of the $300,000 fee. (DX C & Trial Tr. at 463–65).

Throughout the representation, the Firm provided bills and other billing information to Revson. Many if not all of these bills were also sent to Revson's accountants for their review. (*See, e.g.,* PX 2–4, 9–10, 13, 16, 18–19, 21–24; DX I, J; *see also* Trial Tr. at 516–17, 690). At times, the Firm provided Revson with detailed narrative descriptions and at times it sent her the actual time sheets. (*See, e.g.,* DX F, G, I; PX 2–11, 13, 14, 15, 16–24). In or about May 1997, Revson informed Cinque that it was "not necessary" to send the time sheets; Cinque confirmed this in a letter dated May 8, 1997, and advised Revson that the time sheets would be available for her to review at any time at her request. (DX EE).

The relationship between Revson and Cinque became more than just a business relationship. As Revson described it:

He [Cinque] was like a brother that I didn't really have. He was a friend. He and Jane [referring to Jane Klein, Cinque's companion] were both friends. We had a lot of fun times together.

(Trial Tr. at 62–63). At one point, Cinque and Klein visited with Revson and her son and his girlfriend for ten days at a house Revson had rented in Sun Valley. (*Id.* at 184, 465).

In or about February 1997, Cinque and Klein visited Revson at her home in Florida for a working vacation. They were there for several days and Cinque spent some portion of the time working with Revson to prepare for the L & N arbitration. (*Id.* at 65–66, 516, 518–19). After Cinque and Klein left, Revson wrote Cinque a note, which read as follows:

Dear Bob & Jane,

Sadness, tears, love, emptiness, and yet, happiness, belonging and a strong sense of friendship and family fill my heart as your little white car is pulling away from my happy little orange cottage (that *you* got *me* from Riviera).

*Time flies* when we are together. My happiest moments are probably dinner, cocktails, and morning greetings when you *both* are near . . . .

In my life, very few people have believed in me and supported me and took the time out to understand me, *Both* of you did! For this, I *love · both* of you . . . .

One night at dinner, I had mentioned that I would give you 10% (ten percent) of *whatever* you recover for me from L & N. I *want* to unequivocally state that is exactly what "the deal" is. You stood by me and deserve it!

(DX E) (emphasis in original).

Revson was so pleased with the Firm's services that, in early October 1997, she presented Cinque with a Mercedes–Benz, adorned with a red ribbon, as a gift. She did this in recognition of his efforts in representing her, particularly with respect to the licensing matter referred to in Revson's note as "Riviera." After considering the propriety of accepting the car, Cinque decided he had to decline it and he did so. (Trial Tr. at 526–29).

**B.** *The Relationship Ends*

In the fall of 1997, Cinque negotiated, on behalf of Revson, what the parties have referred to as the second Riviera agreement. On December 4, 1997, the deal closed and the agreement was executed at the Carlyle Hotel. The agreement provided for Riviera to pay $2.4 million to Revson—$1.5 million was paid to her at the closing and remaining $900,000 was to be paid over three years. At the closing, Revson gave gifts to Cinque and Riviera's attorney, Michael Weiss. (Trial Tr. at 502–03; *see also id.* at 90–93).

The next morning, Cinque telephoned Revson, in part to discuss whether she would be attending the deposition of a witness for a pending matter involving L & N. During the conversation, he raised the subject of the Firm's fee for its work with respect to the second Riviera agreement. He referred to the ten percent "deal" that Revson had agreed to with respect to L & N and suggested that the Firm deserved a fee of a "little more" than ten percent of the amounts to be paid under the second Riviera agreement. Revson became upset and said she wanted to think about it. (Trial Tr. at 505–07; see also id. at 93–96).

Cinque took the deposition in the L & N matter that day and Revson attended. Cinque did not hear from Revson again until December 10, 1997, when Revson called him together with Chuck Woolston, her accountant. They discussed matters relating to Riviera, but did not discuss the fee issue. (Trial Tr. at 507–08).

The next morning, Cinque saw a fax from Riviera's attorney, Michael Weiss, together with a copy of a modification agreement. The fax was a letter from Weiss to Ronald Witkowski, a different attorney whom Revson apparently consulted about the second Riviera agreement, unbeknownst to Cinque. The fax noted that it and the modification agreement were being sent to Witkowski for his review at Revson's direction; no indication was given that a copy was being sent to Cinque. (DX L).

Although Cinque had negotiated the second Riviera agreement, he was unaware of the proposed modification agreement, and Revson and Woolston had not mentioned it in the telephone conversation the evening before. (Trial Tr. at 508). Cinque was upset by this turn of events, both because he felt the proposed modifications were unfavorable to Revson and because he be-

lieved Revson had gone behind his back. (Trial Tr. at 509–10).

Cinque and Revson spoke at approximately 5:45 p.m. on December 11th. Cinque told Revson he believed she was giving away the rights to Canada for "nothing." They also discussed the issue of the Firm's fees for the second Riviera agreement, and the conversation became heated. Revson finally said to Cinque, "that's it, you are fired," and hung up the telephone. (Trial Tr. at 509–10). Within a minute, a fax arrived at Cinque's office; it was a letter from Revson terminating the relationship. The letter stated in part as follows:

> I write to inform you that I have decided to discharge you and your firm as my counsel for all purposes (including the L & N arbitration), and replace you with Judd Burstein and the firm of Burstein & Fass LLP. . . .
>
> Upon presentation of the detailed billing statement that I have been requesting for months, *I will of course promptly pay all time charges and disbursements due and owing to your firm.*

(DX M) (emphasis added).

### C. *The Filing of this Action*

The termination letter was drafted by Burstein, who had been consulted by Revson a few days earlier. Burstein was on trial at the time in St. Louis, but spoke to Revson by telephone several times. On Friday, December 12, 1997, Cinque spoke briefly with Burstein's colleague, Laurie McPherson. Cinque concluded that he would have to speak with Burstein himself, and McPherson told him that Burstein would communicate with Cinque at his earliest convenience. (Cinque Decl. ¶ 3).[3]

On Monday morning, December 15, 1997, Cinque arrived at his office and was greeted by a letter from Burstein dated December 14, 1997. (*Id.* ¶ 4). In the let-

---

**3.** Cinque submitted two declarations dated June 23, 1999. The first addresses the merits of the sanctions question and will be referred to as "Cinque Decl." The second summarizes the time that the Firm spent on this matter as well as costs incurred. This declaration is referred to as "Cinque Fees Decl."

ter, Burstein threatened to "tarnish" Cinque's reputation and to subject him to the "legal equivalent of a proctology exam":

> I am writing to you in one last effort to avoid litigation that will inevitably tarnish your reputation and, perhaps, reduce the size of your wallet. I am therefore enclosing a copy of a complaint, still being proofread and finalized, that will be filed at Noon on December 15, 1997 unless we can reach an agreement with respect to the release of Ms. Revson's files and your claims for fees....
>
> I apologize in advance for the harshness of this letter. I have no desire to fan the flames of an emotional dispute. Nor do I have the desire to conduct the legal equivalent of a proctology exam on your finances and billing practices. Yet, I will not hesitate to do so unless you begin to act in a responsible manner.

(Burstein 7/15/99 Decl., Ex. U). Burstein wrote this letter without ever having spoken to Cinque.

Within hours, Cinque responded, faxing a detailed, four-page letter to Burstein at noon on December 15th, the deadline set by Burstein. (Cinque Decl. ¶ 7). Cinque's letter sought to accomplish several goals. First, it sought to admonish Burstein for the "inflammatory remarks" and "reckless"language he used in his December 14th letter. Second, it sought to persuade Burstein that the proposed complaint contained material misstatements and omissions, in violation of Rule 11, and allegations that lacked merit. Third, the letter sought to convey the message that Cinque still cared for Revson and that he wanted to resolve the dispute without litigation. The letter provided:

> As I told Ms. McPherson when we spoke Friday morning ... I had a completely open mind as to how best to resolve this disagreement while at the same time avoiding unnecessary burdens and unpleasantness for Ms. Revson.
>
> It is a big mistake for Rommy through you to inflame this already sensitive situation especially where, as here, you recklessly make misstatements of fact which cry out for a public response from me in order to preserve my reputation which you threaten to tarnish.
>
> While Rommy might find this difficult to believe at this moment, I am still one of her strongest supporters and I truly regret that we had this breakdown in communication at what should have been one of the happiest times of our professional relationship....
>
> In closing, let me say that while I find the tactics in which you have engaged as offensive as they are precipitous, and while I am prepared to litigate these horrendous accusations vigorously, I still have enough feeling for Rommy that under appropriate circumstances I would be prepared to talk with her to try and resolve a disagreement which should never have escalated to this point....
>
> If Rommy wants to put all of this behind her quickly and as painlessly as possible, I am prepared to work with her so that we can do it. All she has to do is call me.
>
> On the other hand if she and you opt for litigation calculated to tarnish my reputation, then you and she should carefully consider the nature, basis and accuracy of each of the accusations you make against me—something that neither of you has done thus far as I assure you I shall vigorously defend myself against this outrageous conduct.

(Burstein 7/15/99 Decl., Ex. V).

Despite Cinque's expression of a willingness and desire to discuss resolving the dispute with Revson, neither Burstein nor Revson called him. (Cinque Decl. ¶ 9). Instead, the very next day, this action was filed.

### D. The Allegations Against Cinque

Revson's original complaint in this action, filed on December 16, 1997, contained two claims for relief. The first sought a

declaratory judgment that: (i) Revson was not obligated to pay the Firm any additional fees because the Firm had been discharged "for cause," (ii) the Firm was not entitled to a "bonus," and (iii) the Firm was not entitled to a retaining lien on Revson's files. The second sought an injunction requiring the Firm to turn over Revson's files. The complaint alleged that Cinque had "failed and refused" to produce contemporaneous time records to Revson and that Cinque had made "professionally irresponsible threats" to Revson, including threatening to withdraw as her attorney unless she paid him a bonus. The complaint further contended that Cinque had disobeyed her instructions, that he had accused her of "being greedy," and that he had made false statements to her. (Burstein 7/15/99 Decl., Ex. II). The complaint did not accuse the Firm of fraudulent overbilling.

On December 19, 1997, Revson submitted an affidavit in support of a motion for a preliminary injunction requiring the Firm to turn over her files. (Cinque Decl., Ex. C). The affidavit contained numerous inaccuracies. For example, the affidavit incorrectly alleged that the Firm had refused, despite Revson's requests, to provide time records or an "intelligible breakdown" of bills. (Id., Ex. C, ¶¶ 1, 5). In fact, as the correspondence shows, the Firm had provided Revson with contemporaneous time sheets as well as detailed bills over the years. (See, e.g., DX C, F, G, I; PX 2–11, 13, 14, 16–24). The affidavit incorrectly alleged that the Firm had started representing her in 1994 and that she had "no written retainer agreement," when in fact the Firm had started representing her in February or March of 1993 and she had signed a retainer agreement on March 25, 1993. (Cinque Decl., Ex. C,

¶ 2 & PX 1). The affidavit also suggested that the Firm overbilled her because, as "a two lawyer firm," it could not have billed "almost $400,000 in legal fees" over the prior "three years" or "more than $150,000 in legal fees" over the prior eight months. (Cinque Decl., Ex. C, ¶ 3).[4]

Burstein did not know that Revson's statements were false when they were submitted to the Court and he was entitled to rely on Revson's statements to him.

On December 22, 1997, the parties appeared before Judge Rakoff by order to show cause. The dispute over the release of the files was resolved; Revson agreed to deposit certain funds in escrow, and the Firm agreed to release the files to her new attorneys. (Trial Tr. at 512–13).

On January 5, 1998, Revson filed an amended complaint. (DX U). The amended complaint dropped the false allegations that the Firm had refused to provide Revson with time records, but significantly it added a claim of fraud, alleging, "on information and belief," that the Firm's bills were "based upon fraudulently over-inflated time charges." (Id. ¶ 1; see Cinque Decl., Ex. D). The amended complaint also alleged "on information and belief that [the Firm] has been sending, and [Revson] has been paying, fraudulent time charge bills since sometime in 1994." (Cinque Decl., Ex. D, ¶ 19). Finally, the amended complaint also alleged that the Firm breached its fiduciary duties to Revson by "submitting fraudulent bills" to her. (Id. ¶ 28).

On January 9, 1998, unaware that Revson had filed an amended complaint, the Firm filed an "Answer, Counterclaim and Supplemental Notice of FRCP 11 Violations" in response to the original complaint. (Cinque Decl., Ex. B). The answer

---

4. In fact, the $400,000 in fees had been billed over almost a five-year period. Ironically, after replacing the Firm, Burstein's firm (then four attorneys) was paid more than $1 million in fees by Revson over a period of approximately one year. Those payments included what Burstein described as a "substantial additional bonus." (Cinque Decl. ¶¶ 32, 33 & Ex. S). In a letter explaining his firm's bills, Burstein gratuitously told Cinque that he had said to Revson, when they were discussing fees, that "I am not Bob Cinque." (Id., Ex. S).

set forth in detail Cinque's version of the events in question. The Firm counterclaimed for the fair and reasonable value of its services and also sought sanctions against Revson and her counsel. The Firm later filed an answer to the amended complaint, with a counterclaim and notice of Rule 11 violations. (DX V).

### E. *The Conduct of the Litigation*

I conferenced the case on January 9, 1998. Cinque brought the "proctology" letter to my attention. Burstein was not present, but I expressed to his partner Robert Fass my unhappiness with the letter. I did not impose any sanctions; I merely conveyed my view that the language of the letter was inappropriate.

Burstein responded with a letter to the Court that read in part as follows:

Mr. Fass alerted me to Your Honor's concerns about my letter to Mr. Cinque, dated December 14, 1997. I want to assure Your Honor that I understand and respect your views concerning the manner in which counsel should communicate with opposing counsel and Your Honor's views about aggressive hyperbole. While I respectfully disagree with Your Honor on the issue of attorney conduct, I nonetheless recognize Your Honor's right to insist upon lawyers acting in accordance with the Court's views on the issue. My letter to Mr. Cinque, *which I respectfully believe was proper,* was written before Your Honor was assigned to the case. Had I known that Your Honor would be the Judge in this case, I surely would have toned down the language of my letter, as I would never intentionally act in a manner contrary to the Court's views on attorney conduct. The fact that I respectfully disagree with Your Honor is irrelevant.

(Cinque Decl., Ex. F) (emphasis added). Burstein enclosed a copy of a letter of apology that he had sent to Cinque and concluded his letter to the Court as follows:

Again, I want to make clear that I in no way meant any disrespect to the Court. Nor did I believe that my letter would cause Mr. Cinque any real distress. However, as expressed in my letter to Mr. Cinque, I do apologize for any pain that I may have caused.

(*Id.*). Burstein's letter of apology to Cinque read as follows:

Recognizing and respecting Judge Chin's views as to how counsel should interact with each other, I write to apologize for any pain or upset I may have caused by some of the harsher provisions of my letter to you dated December 14, 1998. Although we may have great differences, it is my hope that we can move past what some may consider overly aggressive behavior on my part, and conduct this case in the manner desired by Judge Chin. I, therefore, want you to know that I see no reason why we cannot deal civilly with each other, and invite communication from you on the issue of settlement.

(Cinque Decl., Ex. G).

Within a few days, Burstein made clear his intent to probe Revson's allegation of fraudulent billing. On January 12, 1998, he wrote to Cinque:

We will be serving our first demand for the production of documents upon you tomorrow. Of particular note is our request for your diaries and your billing records for *other clients.* Such records are necessary for the purpose of proving our claim that your firm did not spend the time working on Ms. Revson's matters that you claimed to have spent.

(Cinque Decl., Ex. H) (emphasis added, footnote omitted). An exchange of letters followed, but the parties were unable to work out their disagreements. In one of those letters, Burstein informed Cinque that Revson had been conducting an "independent investigation" into the identity of Cinque's clients. (Cinque Decl., Ex. J).

On January 26, 1998, Burstein wrote a letter to the Court, which discussed,

among other things, the issue of contacting Cinque's clients:

> [B]efore taking action, I ask for the Court's guidance on the issue of how we may communicate with [the Firm]'s clients. It is my belief that this case may well come down to a dispute over intent, with [the Firm] arguing that its erroneous bills are the product of innocent mistake as opposed to fraud. Accordingly, evidence admissible pursuant to Fed.R.Evid. 404(b) may play a crucial role at trial. Toward this end, we have conducted an independent investigation to ascertain the identity of [the Firm]'s clients, and propose to send the following letter to them:
>
>> We are the attorneys for Rommy Revson, who is involved in a fee dispute litigation with Cinque & Cinque, P.C. In connection with that litigation, we write to inquire whether you would be willing to discuss with us your experiences, good or bad, with Cinque & Cinque's billing practices. This request is for your voluntary cooperation, and you are under no obligation even to respond to this letter.
>>
>> Although we do not believe that a request for information about Cinque & Cinque's billing practices would involve the disclosure of privileged information, you may want to discuss this matter with an attorney. . . .

(Cinque Decl., Ex. K).

I did not have to rule on the issue. At a conference on February 17, 1998, the Firm advised that it was not going to rely on an "innocent overbilling argument" and Burstein indicated that consequently Revson would withdraw her request for Rule 404(b) evidence. This tentative agreement was to be memorialized in a stipulation, but no such stipulation was ever executed. (*See* Burstein 7/15/99 Decl., Exs. PP, QQ).

On or about February 18, 1998, Burstein & Fass issued a subpoena to the Republic National Bank requesting the production of "[a]ll banking records in the name of Cinque & Cinque, P.C . . . . from January 1994 to present." (Cinque Decl., Ex. L). The subpoena in essence told Republic National Bank, with which Cinque had had a banking relationship for twenty years, that the Firm had been sued in federal court. (Cinque Decl. ¶¶ 23, 25). By order dated March 10, 1998, I quashed the subpoena, but denied the Firm's request for sanctions. (Cinque Decl., Ex. M).

In a letter to the Court dated March 11, 1998, Burstein requested a conference to discuss certain discovery issues. He proposed issuing a new, but more limited, subpoena to Republic National Bank for the Firm's banking records and he again expressed a desire to contact "past and present clients" of the Firm (via a letter similar to the one he had suggested before) to develop Rule 404(b) evidence. Burstein concluded his letter by stating, in essence, that if a conference were not convened he would assume that he was "authorize[d] . . . to take these steps without the fear of sanctions." (Cinque Decl., Ex. N).

I did not schedule a conference. Burstein issued a second subpoena on Republic National Bank on March 26, 1998 seeking all "account statements" for the Firm for 1996 and 1997. (Cinque Decl., Ex. O). On June 9, 1998, I issued an order quashing this second subpoena and again denying the Firm's request for sanctions. (Cinque Decl., Ex. P).

Burstein and Revson never contacted any then-current clients of the Firm. During discovery, Burstein (or his firm) did contact a lawyer for a former client of the Firm, but no discussions were had with the client himself. During trial, Burstein (or his firm) also spoke to Michael Stout, Esq., the executor of the Estate of Robert Mapplethorpe. Cinque had previously represented the Mapplethorpe estate on certain matters. During trial, Burstein (or his firm) also contacted another attorney, who was co-counsel for one of the Firm's "very significant client[s]." (8/25/99 Tr. at 49–52; *see* Burstein 7/15/99 Decl. ¶¶ 84–87).

In his search for evidence of fraud, Burstein went so far as to subpoena records from the golf course where Cinque played golf, presumably trying to show that Cinque was playing golf when he supposedly was working. (8/25/99 Tr. at 56).

On June 22, 1998, Burstein sent Cinque two letters. The first was a letter addressed to Cinque; the second was a letter addressed to the Court, which Burstein suggested to Cinque that he would be submitting to the Court. The first letter read as follows:

I am sending you a copy of a letter that is presently being proofread in my office. Unless I hear from you by 2:00 p.m. today that you are willing to settle ... for (a) relinquishment of all claims against Ms. Revson, including your claim for a "bonus," (b) release of all monies presently held in escrow, and (c) the return of monies (amount, payment schedule, and security to be negotiated) to Ms. Revson, we will move forward with our efforts to amend the complaint and to secure additional discovery.

Six months ago, I wrote you a letter which, upon reflection, was discourteous. I again apologize for the tone of that letter. But to the extent that I was merely stating that litigating this case could ultimately prove devastating for you, I was correct. Because *you are a lawyer who, in my view, has acted in a manner that shames all of us in the profession,* I am sorely tempted to just move forward and let you face a jury made up of a public generally unsympathetic to lawyers. However, I have concluded that if I do so, I would only be punishing you for your decision not to retain independent counsel to represent you. For if you had such counsel, he or she would surely advise you not to risk your career and your assets given what might be very charitably characterized as the inadequacies of your time records.

The ball is in your court.

(Cinque Decl., Ex. Q) (emphasis added). Hence, at the same time that Burstein purported to apologize again for the "proctology" letter, he called Cinque "a lawyer who ... has acted in a manner that shames all of us in the profession." (*Id.*).

The draft letter that Burstein threatened to send to the Court stated as follows:

Having finally been afforded the opportunity to review Cinque & Cinque's time sheets on plaintiff's matters, **which reveal stunning evidence of an ongoing fraud on the part of Robert Cinque,** I write to request a pre-motion conference so that we may be granted permission to seek the following relief....

(Cinque Decl., Ex. Q) (boldface in original, footnote omitted). It goes on to describe the requested relief, which included leave to amend the complaint to assert claims, including a RICO claim, against Cinque individually. The proposed letter also sought additional discovery, including discovery as to Cinque's personal finances. It also stated:

I recognize that Your Honor believes that this case is out-of-hand. But the fact is that, as we demonstrate below, Mr. Cinque's own time records, written in his own hand, reveal that *he has engaged in the type of mail fraud that has led to the criminal conviction of other attorneys. See, e.g., United States v. Elliott,* 89 F.3d 1360, 1362–63 (8th Cir.1996). Both as a matter of vindicating my client's rights and as a matter of public policy, attorneys must not be permitted to escape the consequences of such disturbing conduct.

(*Id.*) (emphasis added). The proposed letter contained a chart that purported to show that sixteen of eighteen bills for the period between February 1, 1996 and November 1997 were inflated, by an average of approximately 18%. Although Burstein did not provide a copy of the proposed amended pleading, his letter did note that the proposed amended complaint would al-

lege "that Cinque & Cinque's other clients have been similarly defrauded." (*Id.*).

James Cinque responded on behalf of the Firm. He noted that he had discussed the Firm's time-keeping records with Burstein's partner, Robert Fass, at the outset of the litigation, and that he had explained to Fass that the Firm recorded time in increments of one-quarter of an hour. Moreover, James Cinque pointed out that this had been the Firm's billing practice during the five years it represented Revson, and that this procedure had been explained to Revson and her accountants. (Cinque Decl., Ex. R).[5]

On March 15, 1999, Revson moved (1) for partial summary judgment dismissing the Firm's counterclaim to the extent it sought, on a contractual basis, a percentage upward adjustment in legal fees and (2) *in limine* for certain evidentiary rulings.

On April 19, 1999, about a month before the scheduled start of trial, an article appeared in the New York Observer about this case. *See* Matt Fleischer, *Lawyer, Scunci Queen Tangle Over Legal Fees*, N.Y. Observer, Apr. 19, 1999, at 9. Revson is quoted at length, and the article provides extensive details about the dispute between Revson and the Firm. It reports that Revson had asked the Court "to declare the bulk of Mr. Cinque's bills fraudulent or unjustified." It also quotes two former clients of the Firm. The article noted that Cinque had been contacted but "declined to discuss details of the case," although Cinque did provide some general comments. Cinque testified at trial that the reporter told him that Burstein had contacted the reporter about the case. Burstein gave the reporter a number of documents, some of which were quoted in the article. (Trial Tr. at 673–75).

On May 3, 1999, I granted Revson's motion in part and denied it in part. *Revson v. Cinque & Cinque, P.C.*, No. 97 Civ. 9236(DC), 1999 WL 280419 (S.D.N.Y. May 4, 1999). I held that the Firm was not entitled to a percentage recovery as a contractual matter because contingency fee arrangements had to be in writing, and the only writing that arguably set forth a contingency fee agreement was Revson's handwritten February 12, 1997 note. The note, however, only referenced L & N, and the Firm had been discharged before the L & N matter was concluded. I held that the Firm could seek an upward adjustment from its time charges on a quantum meruit basis and that it could rely on the note in arguing the reasonable value of its services. *Id.* at *1.

Immediately upon receipt of my decision, Burstein wrote Cinque a letter, purportedly seeking to discuss settlement. In the letter, Burstein predicted not only that the Firm would not recover any additional fees but that the jury would award an "additional fee forfeiture." In addition, Burstein wrote:

> [I]f this case is not settled, Ms. Revson intends to sue you for your malpractice (just discovered) in failing to take steps to clear title to her Florida home when she purchased it. That action will be brought against you in Florida.

> In sum, the time has come for you to act responsibly. Just as I told you (too forcefully, I apologetically concede) in December of 1997; you were wrong about your right to a bonus on Riviera. You will be proven wrong again if we go forward to trial on the issue of your right to any of the escrowed funds. Perhaps more importantly, *I promise you that you will regret subjecting*

---

**5.** The letter also stated:

Your letter of this morning is just one further attempt at abusing the litigation process. I understand that this is not the first time you have sued lawyers in an effort to dissuade them from the continued representation of a client or the prosecution of a

claim. Your latest tactics here are nothing more than a proliferation of your initial threat to tarnish my brother's reputation, reduce the size of his wallet and engage in what you described as "legal proctology." (Cinque Decl., Ex. R).

*yourself to a public trial in which your conduct will be subject to scrutiny which I do not believe it can withstand. I strongly suggest that you cut your losses now.*

(Cinque Decl., Ex. T) (emphasis added).

The case did not settle, and trial commenced on May 17, 1999.

### F. *The Trial*

#### 1. *Burstein's Tactics*

Burstein went on the attack right in his opening statement at trial, calling Cinque "a disgrace to the legal profession." (Trial Tr. at 6). He contended that in December 1997 Cinque was so "desperate for money he resorted to ... extortion." (*Id.* at 9). He went on to say that the proof was "going to show that there is a reason why lawyers are sometimes referred to as snakes. It is this kind of conduct that gives lawyers a bad name and it's disgraceful." (*Id.* at 17–18). Burstein concluded his opening statement with the following:

> There is an old joke about a little boy who's walking by a cemetery, and he sees a gravestone and it says, Here lies a lawyer and an honest man and he turns to his mother and he says, Mommy, why did they put two people in that grave? What you're going to find in this case is [that it is] because of conduct like Robert Cinque's that we have jokes like that, that lawyers are held in such disrepute....
>
> I'm going to ask you ... to make Robert Cinque pay a heavy penalty in the form of damages and fee forfeiture for his horrendous conduct, for his horrendous breach of professional ethics, horrendous breach of Rommy Revson's trust.

(*Id.* at 19).

In summation, Burstein returned to the theme, contending that "the reason why lawyers are held in such low repute is [the] kind of conduct" purportedly engaged in by Cinque. Indeed, he called Cinque's conduct "slimy." (Trial Tr. at 776).

Before the first witness was called, Burstein raised an issue as to whether Jane Klein, Cinque's companion, should be excluded from the courtroom as a potential witness. I ruled that Klein was to be excluded if there was some reasonable possibility that she would be called as a witness by the Firm. Rather than have Klein excluded from the courtroom, Cinque agreed not to call her as a witness, so that she would be permitted to remain in the courtroom during the trial. (Trial Tr. at 34–35). In summation, Burstein sought to argue that the jury should draw a negative inference from the fact that Cinque "never called [her] to testify." (*Id.* at 784). I stopped Burstein from making the argument, for it was his request to have Klein excluded from the courtroom that caused Cinque to agree not to call her as a witness. The trial transcript shows the following:

> MR. BURSTEIN [to the jury]: ... How come he never called Ms. Klein to testify? She was here the whole time.
>
> THE COURT: You know, that's an inappropriate argument.
>
> MR. BURSTEIN: I'will move on.
>
> THE COURT: You know very well that Mr. Cinque said he was going to call Ms. Klein and you objected to having her sit in the courtroom.
>
> MR. BURSTEIN: That's not what happened, Judge.
>
> THE COURT: That's what happened, Mr. Burstein. It is an inappropriate argument. Move on. Move on.

(Trial Tr. at 784).

When Cinque testified, Burstein cross-examined him by, among other things, suggesting to the jury "that no less than three judges in this very courthouse [had] criticized [Cinque] for unprofessional conduct and actually sanctioned [him]." (Trial Tr. at 534). One of those purported incidents was a decision issued by Judge Lloyd F.

MacMahon in 1969 criticizing the law firm with which Cinque was then associated for making a "frivolous" request for an adjournment of a trial. Although Cinque is listed as one of the two attorneys for the firm, he was a first-year associate at the time, and he obviously played no role in the decision to ask for an adjournment. Burstein's cross-examination of Cinque on this basis was unfair. (Id. at 540–41, 607).

During the trial, outside the presence of the jury, I questioned why the case was being tried to a jury, as I was of the view that issues relating to fee agreements and the interpretation thereof were more appropriately addressed to the Court. Burstein responded by criticizing Cinque, saying, "He blew it. I would have never done it on a jury trial." (Trial Tr. at 595). In fact, however, Burstein had filed, on behalf of Revson, a written demand for a jury trial. (Cinque Decl., Ex. W).

Before the start of trial on Monday, May 17, 1999, Burstein advised the Court that he had just served a subpoena on the Firm for certain L & N records, including, for example, deposition digests. He explained that he had faxed a copy of the subpoena to the Firm the day before, Sunday. Cinque explained that the records were in his garage in his home in East Hampton. I said that I did not expect him to return to East Hampton to retrieve the records because he was trying the case and did not receive the subpoena until that morning. (5/17/99 11:00 a.m. Tr. at 9–11). Despite these circumstances, during the trial Burstein sought to cross-examine Cinque on whether he had the digests. (Trial Tr. at 643). In fact, as Burstein well knew, the digests were in Cinque's East Hampton garage and I had held that because the subpoena was not served until the first day of trial Cinque was not required to return to East Hampton to retrieve them. (Trial Tr. at 644–45).

### 2. Revson's Testimony

Revson testified and told the jury of her purported unhappiness with Cinque as her lawyer, that she had found him "very difficult to speak to," and that he was unprepared. (Trial Tr. at 63–64). She tried to explain that she gave the Mercedes to him, notwithstanding her unhappiness, because she was trying "to be very nice" and "to get his attention." (Id. at 62–63). She explained that she had written the note to Cinque, in which she praised him, to "pad[ ] his ego," because "you get better results with honey than with vinegar." (Id. at 71).

With respect to billing, when asked whether the Firm had ever reduced its fees for not having achieved a "good result," she responded, "Absolutely not." (Id. at 49). She also testified that she "always paid" the Firm "by the hour." (Id. at 59; see also id. at 61). With respect to the Florida visit from Cinque and Klein, she testified that Cinque could not have worked twelve or thirteen hours on her case that week, although she acknowledged that she and Cinque worked one afternoon together on the case. (Id. at 68).

With respect to the second Riviera agreement, Revson testified that the morning after the closing, Cinque telephoned her and brought up the subject of his "bonus." (Id. at 94). She testified that in a conversation the following week:

> what he said was, he called me a greedy bitch. He said, You greedy bitch, you got all this money. I got all this money for you and you're not going to give me a bonus. No other lawyer in the world could have done this for you, blah, blah, blah. I said, I'm greedy? I said, No. You're fired.

(Id. at 107–08).[6]

### 3. Burstein's Apologies

Burstein purported to apologize for his conduct at least four times, in writing,

---

**6.** In contrast, Revson had not previously contended in any court document or at her deposition that Cinque had called her a "greedy bitch." (See Trial Tr. at 143–47, 157–58).

prior to trial. (Cinque Decl., Exs. F (letter to Court), G, Q, T (letters to Cinque)). During trial, he purported to apologize again.

On the third day of the trial, after I made an evidentiary ruling, McPherson, Burstein's partner, made a face. I admonished her to stop making faces. (Trial Tr. at 600). McPherson responded by saying:

> I apologize, your Honor, I didn't realize I was doing it. I am somewhat surprised at your ruling, and that's the only reason I'm reacting.

(*Id.* at 601). I commented that McPherson was "compounding the disrespectfulness" by stating that she had made a face because she was "surprised" at my ruling. (*Id.*). Burstein responded, "You're a hundred percent correct, your Honor. I apologize." (*Id.*). McPherson also apologized.

That evening, I received a fax from Burstein. He raised a number of issues on the merits, but also stated the following:

> I want to express, on behalf of both Ms. McPherson and myself, our profound apology for any conduct on our part which Your Honor has found to be objectionable. Just as I certainly did not intend to be guilty of "games playing," I can assure Your Honor that Ms. McPherson did not intend to be disrespectful in the least. But that is not the point. Our obligation is to act in a manner that Your Honor deems appropriate, and I promise that we will do our level best to meet that obligation. I just want to assure Your Honor that there was absolutely no intentional disrespect of the Court, and I apologize if our conduct led Your Honor to conclude otherwise.

(5/19/99 Burstein Letter to the Court).

The next morning, Thursday, May 20, 1999, before the start of trial, I expressed the view that Burstein's apology, as set forth in his May 19, 1999 letter, was not "a sincere one." (Trial Tr. at 604). I commented that the May 19th letter was similar to Burstein's letter apologizing for the proctology letter in that both letters suggested that Burstein was not genuinely sorry for his behavior, but that instead he was merely sorry for having offended me. I expressed the view that Burstein was implicitly suggesting that I was being unduly sensitive. (*Id.*). I went on to state that the proctology letter and Burstein's tactics were inappropriate and that they had given Cinque little choice but to litigate this case. (*Id.* at 604–07).

The trial concluded that day and the jury began, but did not complete, its deliberations. The case was adjourned until the following week.

The next day, I received another fax from Burstein. This letter stated:

> I have given considerable thought to Your Honor's comments of yesterday morning, and I wanted to respond.... [A]s I continued to think about the matter last night and today, I had to face up to the fact that I was wrong and that Your Honor was right....
>
> I agree with and apologize for the inadequacy of the apology contained in my letter of May 19. Having reread the letter, which was written late in the evening and under considerable stress, I can see that Your Honor's criticism was entirely appropriate. The letter is fairly read as conveying an apology for upsetting Your Honor instead of as an apology for inappropriate behavior....
>
> Your Honor was of course completely correct that there can be no justification for a lawyer making faces in response to a Court's ruling, and that Ms. McPherson's explanation substantially and wrongly exacerbated the improper conduct....
>
> I also want to discuss the "proctology" letter.... Upon reflection, the bulk of Your Honor's criticism of me yesterday on that score was also correct. While I believe that this litigation would have ensued regardless of what I had written, that does not change the facts that *I could not have been more wrong about*

*sending that letter to Mr. Cinque,* and that my subsequent letter to Your Honor should have acknowledged that error. Instead, as I unfortunately did in connection with my May 19 letter, I wrongly apologized only for offending Your Honor—thereby improperly and unfairly suggesting that Your Honor was just being hypersensitive. *The fact is that the "proctology" letter was improper, offensive, and should not have been sent as written. I made a significant error in judgment, which I then compounded by not owning up to it. Aggressive litigation tactics are one thing, but I recognize that I went over the line.* It will never happen again.

It is important to me that Your Honor appreciate the depth and sincerity of this apology, and that, if possible, Your Honor accept it. I say this because of the great respect and admiration I have for Your Honor. Your Honor's distaste for this case in general has been oft-stated. Similarly, and although I vigorously disagree, Your Honor has also made clear your view that Mr. Cinque has the better side of this dispute. At the same time, though, Your Honor has, as a judge should, risen above those views and given Ms. Revson *an extraordinarily fair jury trial.* While I believe that some of the Court's legal rulings were erroneous and prejudicial to Ms. Revson, *I also believe that this case has been a model of what a jury trial should be.* In particular, I greatly appreciate and respect the fact that the Court's anger at me and its own views of the evidence have never been exhibited to the jury in the slightest fashion. . . .

In sum, I hope this letter adequately expresses both *my remorse about my conduct and the conduct of my firm,* as well as my tremendous respect for Your Honor. It is my hope that, from this point on, I can reverse Your Honor's opinion of me.

(Burstein 7/15/99 Decl., Ex. HH) (emphasis added).

### 4. *The Verdict*

On May 24, 1999, the jury returned its verdict. It found that Revson discharged the Firm "without cause," that the Firm did not breach its fiduciary duties to her, and that the Firm was entitled to recover $670,000 in fees from Revson. The jury concluded that the Firm performed extraordinary work for Revson, for it determined that the fair and reasonable value of the services provided by the Firm was more than four times what the fees would have been at the Firm's usual hourly rates. The jury rejected Revson's claim that Cinque had abandoned her or sought to extort her into giving him a bonus.

### G. *The Harm to Cinque and the Firm*

Burstein's actions harmed the Firm and Cinque. Cinque explained in his summation that "[e]very effort has been made to malign, slander and libel me" and that "Cinque & Cinque for the past year and a half . . . ha[s] been subjected to some of the worst claims of fraud you can imagine." (Tr. 754–55). In describing the damage done to his and the Firm's reputation, Cinque explained:

> For a year and a half Jim and I have been living with these claims of fraud. . . . As lawyers, we don't have a lot more—we don't have an inventory. We have our integrity. . . . [A]nd when someone challenges us as frauds, you don't even have to be a professional to realize that hurts. And they assaulted me in every way they could. They assaulted my brother, the firm, Cinque & Cinque. Denigrated us. Hurt us. And they succeeded. They succeeded, I am frank to tell you.

(Trial Tr. at 769–70).

At one of the sanctions hearings, Cinque explained:

> Then my life became a living hell, because once [Burstein] seized upon the concept that he was now going to accuse me of fraud as a lawyer, which is a very serious allegation, what did he do? He

built upon the fraud claim consistently, claiming I'm a fraud with Ms. Revson, then I must be a fraud with all my clients.

(8/25/99 Tr. at 48). He added:

> The letters [Burstein] was writing, could you understand possibly how I might have been so beside myself at some point where I am threatened with criminality, loss of my entire practice, 30 years down the drain that maybe I could have gotten violent with the man? Can anyone understand that? I'm not saying it would have been appropriate, obviously. But calling me a criminal? Taking my entire 30 years of existence.

(*Id.* at 57).

The Firm spent some $271,456 worth of time (at hourly rates of $325 for Cinque and $300 for James Cinque) litigating the merits and another approximately $25,000 in time addressing the issue of sanctions. In addition, the Firm incurred disbursements of $3,279.42. (Cinque Fees Decl., Ex. A; James Cinque Fees Decl., Ex. A).

## H. *The Order To Show Cause*

On May 25, 1999, I issued a memorandum and order raising my concerns as to the propriety of Burstein's and Revson's conduct in this case and directing Burstein and Revson to show cause why I should not sanction them pursuant to Rule 11, the Court's inherent power, and/or 28 U.S.C. § 1927. *Revson v. Cinque & Cinque, P.C.,* 49 F.Supp.2d 686, 688 (S.D.N.Y.1999).

In response, Burstein engaged counsel for himself and separate sanctions counsel was obtained for Revson. Burstein, Revson, and the Firm made extensive written submissions and I conducted hearings on August 18 and 25, 1999. The parties did not testify or call witnesses, although they were given the opportunity to do so, but counsel as well as Burstein and Cinque addressed the Court.

## DISCUSSION and CONCLUSIONS OF LAW

### A. *Mackler*

Burstein and Revson raise a threshold issue: They contend that I must recuse myself—unless I accept their version of the facts—because I am not impartial and they are entitled to an "impartial fact-finder." Quoting from the Second Circuit's decision in *Mackler Prods., Inc. v. Cohen,* 146 F.3d 126 (2d Cir.1998), they argue that they are entitled to the "procedural protections appropriate to a criminal case," including the presumption of innocence, the requirement of proof of guilt beyond a reasonable doubt, and a trial. *Id.* at 130.

In *Mackler,* the Second Circuit held that "the imposition of a sufficiently substantial punitive sanction requires that the person sanctioned receive the procedural protections appropriate to a criminal case." *Id.* at 130. The Court distinguished between "punitive" and "compensatory" sanctions, noting that a compensatory sanction did not require the "full panoply of criminal procedure safeguards" but only notice and an opportunity to be heard. *Id.*

The Second Circuit identified certain factors that may be considered in determining whether a sanction is punitive or compensatory: whether the sanction is intended to be punitive or compensatory; whether it is retrospective (*i.e.,* for past wrongful conduct); whether it seeks to coerce future compliance; whether there is an opportunity to purge; whether the sanction is payable to the Court or to the injured party; and the size of the sanction. *Id.* at 129. The Court held that a sanction of $10,000 imposed on a party and his attorney was punitive because the district court intended it to be punitive, labelled it as such, imposed it for past conduct without giving an opportunity to the sanctioned party and attorney to purge, and ordered the funds to be paid to the court rather than the injured party. The Second Circuit vacated the award of sanctions and remanded to the district court to consider

reimposing sanctions against the attorney (the other sanctioned party did not appeal) after giving him the benefit of criminal procedural protections.

Without much discussion as to the differences between punitive and compensatory awards, the Court in *Mackler* also held that a second sanctions award of $45,-000 was compensatory, although it vacated this sanctions award on the grounds of insufficient notice and an insufficient factual basis. *Id.* at 130. The $45,000 sanction was imposed for the same conduct for which the $10,000 sanction was imposed, but the $45,000 sanction was labelled by the district court a "compensatory assessment[ ]" and was to be paid to the injured party for attorneys' fees and costs incurred during the trial, appeal, and sanctions hearing. *Mackler Prods., Inc. v. Turtle Bay Apparel Corp.*, No. 92 Civ. 5745, 1997 WL 269505, at \*16 (S.D.N.Y. May 21, 1997), *vacated and remanded sub nom. Mackler Prods., Inc. v. Cohen*, 146 F.3d 126 (2d Cir.1998).

I conclude that *Mackler* does not require that Burstein and Revson be awarded the procedural protections of a criminal case, and the request that I recuse myself unless I accept their version of the facts is denied.

First, the sanctions that I impose are intended to be compensatory. They are to be paid to the Firm to compensate the Firm and Cinque for a portion of the time they spent litigating this case.

Second, in the context of attorney misconduct, *Mackler* must be narrowly construed. Attorneys are officers of the court, and they have special duties to the court that non-attorney clients do not have. Courts traditionally have had the power to supervise attorneys; that power would be seriously undermined if attorneys who engaged in misconduct in a court proceeding were entitled to the criminal protections of a criminal case before the court could impose sanctions. *Mackler* can only mean that criminal protections are required only when the sanction is clearly punitive.[7]

Third, I have no biases against or animosity toward Revson or Burstein. Throughout this litigation my rulings were made on the merits. I gave Burstein, in particular, every benefit of the doubt. I did not sanction him when the "proctology" letter was first brought to my attention; I merely admonished him informally. I denied the requests for sanctions when I quashed the first and second bank subpoenas, even though I was troubled by Burstein's conduct. Again, I gave him the benefit of the doubt. It was only because Burstein's conduct continued that I decided to issue an order to show cause.

In retrospect, my order to show cause probably should have been more neutrally worded, but I had concerns and I wanted to share those concerns with Burstein and Revson so that they would have a full

**7.** The Supreme Court's recent holding in *Cunningham v. Hamilton Co.*, 527 U.S. 198, 119 S.Ct. 1915, 144 L.Ed.2d 184 (1999), that an order imposing sanctions against an attorney pursuant to Fed.R.Civ.P. 37(a) is not immediately appealable (but must await a final judgment on the merits) is instructive. The Court observed:

> To permit an immediate appeal from such a sanctions order would undermine the very purposes of Rule 37(a), which was designed to protect courts and opposing parties from delaying or harassing tactics during the discovery process. Immediate appeals of such orders would undermine trial judges' discretion to structure a sanction in the most effective manner. They might choose not

to sanction an attorney, despite abusive conduct, in order to avoid further delays in their proceedings. Not only would such an approach ignore the deference owed by appellate courts to trial judges charged with managing the discovery process, it could also forestall resolution of the case as each new sanction would give rise to a new appeal.

*Id.* at 1922 (footnote and citation omitted). The same reasoning applies to sanctions in general. If parties and attorneys who engage in misconduct or file frivolous claims or defenses are entitled to criminal procedural protections, including arguably a jury trial, trial judges will be extremely reluctant to impose sanctions even for egregious conduct.

opportunity to address them. The fact that I had those concerns and made them known, however, is no basis for my recusal. It cannot be the case that every judge who has concerns about an attorney's conduct is disqualified from considering the question of sanctions. I have carefully considered Burstein's and Revson's explanations and arguments and I have carefully reviewed their voluminous submissions. I have done so with an open mind.

Significantly, Burstein has previously recognized my ability to be fair. In his apology letter written to me while the jury was deliberating, Burstein wrote of his "great respect and admiration" for me. He wrote that I had "given Ms. Revson an extraordinarily fair jury trial" and conducted "a model of what a jury trial should be." He noted also that my feelings toward him and my "own views of the evidence ha[d] never been exhibited to the jury in the slightest fashion." (Burstein 7/15/99 Decl., Ex. HH).

Finally, it is worth noting that the Local Civil Rule governing the discipline of attorneys permits a judge either to address a disciplinary matter that arises in one of his or her cases or to refer the matter to the Committee on Grievances. Local Civil Rule 1.5(f) provides:

> The remedies provided by this rule are in addition to the remedies available to individual judges and magistrate judges under applicable law with respect to lawyers appearing before them. Individual judges and magistrate judges may also refer any matter to the chief judge for referral to the Committee on Grievances to consider the imposition of discipline or other relief pursuant to this rule.

S.D.N.Y. & E.D.N.Y. Local Civil R. 1.5(f).

It is important that I consider the issue of whether sanctions should be imposed against Burstein and Revson. The proceedings occurred before me, in a case that I was supervising, and I am intimately familiar with the facts.

Under these circumstances, the request for my recusal is denied.

### B. *Revson*

██ I have decided not to impose sanctions against Revson, even though it is crystal clear that she made false statements in this case. She falsely stated, among other things, that she retained the Firm in 1994, that she did not have a written retainer with the Firm, and that the Firm had refused to provide her with contemporaneous time records. Indeed, Burstein concedes that these statements were inaccurate, but contends that Revson "had an innocent failure of recollection," that she made an "innocent error," or that the error was corrected. (Burstein 7/15/99 Decl., ¶¶ 58, 60, 61). He acknowledges further that Revson gave "very inaccurate testimony" at her deposition, but contends that these were "innocent failures of recollection" that occurred because Revson "had been flustered and unnerved" and "confused" at her deposition. (Burstein 8/13/99 Decl. ¶ 2).

I am also convinced that Revson testified falsely at trial about her final conversation with Cinque, during which she alleges that he called her a "greedy bitch" and threatened to abandon her if she refused to pay him a "bonus." The jury rejected this testimony as well, as it found that the Firm had been discharged without cause.

Revson's misstatements and false testimony are extremely troubling. Nonetheless, I am not imposing sanctions on her. First, Revson is a party and not an attorney. She is not an officer of the court and thus different considerations come into play; for better or worse a judge cannot impose sanctions every time he or she believes that a party testifies untruthfully. Indeed, it may be that under *Mackler* Revson could not be sanctioned on the basis of what would be tantamount to a finding of perjury without being afforded criminal procedural protections first. In addition, Revson was entitled to bring an

action to recover her files and to defend against the Firm's counterclaims.

Second, judgment has already been entered against Revson in the amount of $732,370, consisting of the verdict of $670,000 plus prejudgment interest of $62,370.

Third, Burstein has represented to the Court that he made the "litigation decisions" in the case and that he "was responsible for the tactics and strategies adopted during the litigation." (Burstein 7/8/99 Aff. ¶ 2).[8]

For these reasons, I will not impose sanctions against Revson. I will, however, tax her costs of $3,279.42, consisting of the Firm's disbursements.

## C. *Burstein*

### 1. *Applicable Legal Standards*

#### a. *Civility*

In recent years, much concern has been expressed by the bench and the bar over the rise of "Rambo" tactics in litigation and the lack of civility in the practice of law. *See, e.g.,* Marvin E. Aspen, *A Response to the Civility Naysayers,* 28 Stetson L.Rev. 253, 253 (1998) (civility is the "current hot topic of the legal lecture circuit"); Bruce A. Green, *The Ten Most Common Ethical Violations,* 24 No. 4 Litig. 48, 48 (1998) (noting that "[l]eaders of the organized bar now see [incivility] as the most worrisome ethical problem"); *see also* Jerome J. Shestack, *Defining Our Calling,* 83 A.B.A. J. 8 (Sept.1997) (urging lawyers to "resist the rise of Rambo-type tactics in which civility is mocked and ruckus is routine").

Civility refers to "more than surface politeness; it is an approach that seeks to diminish rancor, to reconcile, to be open to nonlitigious resolution." Shestack, *supra,* at 8. A lawyer can be civil and courteous while still being tough and aggressive. "Civility is not inconsistent with zealous

advocacy." Robert C. Josefsberg, *The Topic Is Civility: You Got a Problem With That?,* 59 Or. St. B. Bull. 19, 19 (Jan.1999). It is inconsistent with "Rambo" lawyering, which is characterized by:

A mindset that litigation is war and that describes trial practice in military terms.

A conviction that it is invariably in your interest to make life miserable for your opponent.

A disdain for common courtesy and civility, assuming that they illbefit the true warrior.

A wondrous facility for manipulating facts and engaging in revisionist history.

A hair-trigger willingness to fire off unnecessary motions and to use discovery for intimidation rather than fact-finding.

An urge to put the trial lawyer on center stage rather than the client or his [or her] cause.

Robert N. Sayler, *Why Hardball Tactics Don't Work,* 74 A.B.A. J. 78, 79 (Mar. 1988).

Justice Sandra Day O'Connor has observed that more than half of all practitioners report "dissatisfaction with the profession" and that for many the practice of law has become "pointless and no fun." Sandra Day O'Connor, *Professionalism,* 76 Wash. U.L.Q. 5 (1998). She attributes this trend in part to the lack of civility in the profession:

These statistics mean that lawyers far too often breach their professional obligations to other lawyers—that many lawyers are caught up in a system of behavior that is "structurally, morally, and emotionally exhausted." When the lawyers themselves generate conflict, rather than focusing on the dispute between the parties they represent, it distorts our adversarial system. More civility and greater professionalism can

---

8. Again, I note that I do *not* find that Burstein knowingly submitted Revson's false statements to the Court.

only enhance the pleasure lawyers find in practice, increase the effectiveness of our system of justice, and improve the public's perception of lawyers.

*Id.* at 8 (footnotes omitted).

A number of "civility" codes have been adopted. While these codes are aspirational in nature, they provide guidance for the issues at hand. *See* Prof'l Ethics Comm. of the Fed. Bar Ass'n, *Standards for Civility in Professional Conduct* ¶ 1 (1998) ("In carrying out our professional responsibilities, we will treat all participants in the legal process, including counsel and their staff, ... in a civil, professional, and courteous manner, at all times and in all communications, whether oral or written."); *id.* ¶ 3 ("We will not ... engage in offensive conduct directed toward other participants in the legal process, nor will we abuse other such participants in the legal process."); ABA Lit. Section, *Guidelines for Litigation Conduct* ¶ 1 (Aug.1998) ("We will treat all other counsel, parties, and witnesses in a civil and courteous manner, not only in court, but also in all other written and oral communications."); *id.* ¶ 2 ("We will not ... abuse or indulge in offensive conduct directed to other counsel, parties, or witnesses."); *Standards of Civility,* 22 N.Y.C.R.R. § 1200, App. A ("Lawyers can disagree without being disagreeable. Whether orally or in writing, lawyers should avoid vulgar language, disparaging personal remarks or acrimony toward other counsel, parties or witnesses.").

The Code of Professional Responsibility is not purely aspirational in nature, and it prohibits a lawyer from acting in an uncivil, demeaning, or harassing manner. Canon 7 provides that "a lawyer should represent a client zealously within the bounds of the law." N.Y.Code of Prof'l Responsibility Canon 7 (1998) (hereinafter, "N.Y.Code"). DR 7–101(A)(1) explains, however, that a lawyer does not violate his duty to represent a client zealously "by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process." N.Y.Code DR 7–101(A)(1). Likewise, DR 7–102(A)(1) prohibits an attorney from taking action "merely to harass or maliciously injure another." *Id.* at DR 7–102(A)(1). DR 1–102 provides that a lawyer shall not "[e]ngage in conduct that is prejudicial to the administration of justice." *Id.* at DR 1–102(A)(5). EC 1–7 provides that "[a] lawyer should avoid bias and condescension toward, and treat with dignity and respect, all parties, witnesses, lawyers, court employees, and other persons involved in the legal process." *Id.* at EC 1–7. EC 7–37 explains that "[h]aranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system." *Id.* at EC 7–37. Finally, DR 7–105 provides that "[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." *Id.* at DR 7–105.

The bar should take note, as this case well shows, that Rambo tactics do not work. Judges and juries do not like them. The tactics employed by Burstein here did not prevent the jury from returning a substantial verdict against Revson and they undoubtedly contributed to the result. There is a lesson to be learned. As one commentator has observed, "It defies all common experience to believe that mean-spiritedness is persuasive.... Hardball is bad advocacy." Sayler, *supra,* 74 A.B.A. J. at 80; *see also* John G. Koeltl, *From the Bench,* 23 No. 3 Litig. 3, 3 (1997) ("Incivility is counterproductive. Lawyers should be civil in litigation not only because it is the right way to practice law—which it is—but also because lawyers hurt their clients and themselves by being mean-spirited, nasty, rude, and generally uncooperative with their adversaries and the court."); Edward M. Waller, *Judicial Activists Wanted,* 84 A.B.A. J. 116, 116 (June 1998) ("Experienced counsel know that the lawyer who maintains a professional style is the more effective advocate.").

Incivility and Rambo tactics do not make sense, no matter what the outcome of the case. As Justice O'Connor has noted:

> [I]ncivility disserves the client because it wastes time and energy—time that is billed to the client at hundreds of dollars an hour, and energy that is better spent working on the case than working over the opponent. According to an English proverb, "[t]he robes of lawyers are lined with the obstinacy of clients." In our experience, the obstinacy of one lawyer lines the pockets of another; and the escalating fees are matched by escalating tensions. I suspect that, if opposing lawyers were to calculate for their clients how much they could save by foregoing what has been called 'Rambo-style' litigation (in money and frustration), many clients, although not all, would pass in the pyrotechnics and happily pocket the difference.

O'Connor, *supra,* 76 Wash. U.L.Q. at 9 (footnotes omitted); *see also* Judith S. Kaye, *Lawyering for a New Age,* 67 Fordham L.Rev. 1, 8 (1998) ("[C]lients are now realizing that arms manufacturers and lawyers are probably the only ones who gain by policies of mutually assured destruction. It is very expensive to scorch the earth.").

Civility is also important from a broader perspective:

> As lawyers and judges, we live out who we are by our actions. Professionalism is not something to don at the office or take off with our suits and our robes; our behavior continuously demonstrates who we are. We can improve our own lives and spirits, those of our clients, opposing counsel and parties and the community as a whole, if we simply remember that our part in the system gives us tremendous power, to make life better for every citizen.... If every lawyer and judge ... would analyze every action she or he takes in light of the goal of ensuring that the system works fairly and efficiently for everyone, ques-

tions about professionalism would simply disappear—and tremendous good would result for our community.

Wallace P. Carson, Jr. & Barrie J. Herbold, *Why "Kill All the Lawyers"?,* 59 Or. St. B. Bull. 9, 12 (Jan.1999).

For all these reasons, the commentators have repeatedly urged the courts to address the problem of incivility. *See, e.g.,* Bartlett H. McGuire, *Reflections of a Recovering Litigator: Adversarial Excess in Civil Proceedings,* 164 F.R.D. 283, 297–303 (1996) (suggesting how the judiciary can curb litigators' excesses); Jerome J. Shestack, *Advancing Professionalism Needs Judicial Help,* 84 A.B.A. J. 8 (Apr. 1998) (discussing a judge's responsibility and authority to advance professionalism by refusing to tolerate Rambo tactics and incivility); Gerald W. Heller, *Sanctioning Attorney Misconduct: Playing by the Rules,* 45 Fed. Law. 38, 38 (Jan.1998) (urging the use of Rule 11 and other sanctions to eliminate "Rambo-style tactics"); Cornelius Wallis Honchar, *"Rambo" Litigators Can Be Disarmed With Sanctions,* Chi. Daily L. Bull., Nov. 4, 1994, at 5 (noting that "case law is developing to combat uncivil, unprofessional conduct"); Gideon Kanner, *Welcome Home Rambo: High–Minded Ethics and Low–Down Tactics in the Courts,* 25 Loy. L.A. L.Rev. 81, 82 (1991) (arguing that judges should take a more active role in policing misconduct and that judicial tolerance "is a substantial factor which lies at the root of the Rambo litigation phenomenon").

### b. *The Sanctions Machinery*

■ My order to show cause specified three possible bases for imposing sanctions: Rule 11, section 1927, and the Court's inherent power. I have determined that an award of sanctions under Rule 11 would not be appropriate. My concern is not with the filing of any particular "pleading, written motion, or other paper," but with the pattern of conduct engaged in by Burstein. Accordingly, I

will proceed only under section 1927 and the Court's inherent power.

■ Section 1927 provides:

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927 (1994). Section 1927 requires a showing of "subjective bad faith by counsel." *Ted Lapidus, S.A. v. Vann,* 112 F.3d 91, 96 (2d Cir.1997); *accord Keller v. Mobil Corp.,* 55 F.3d 94, 99 (2d Cir.1995). Sanctions may be imposed under section 1927 against an attorney when the attorney's actions are " 'so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay.' " *Keller,* 55 F.3d at 99 (quoting *Oliveri v. Thompson,* 803 F.2d 1265, 1273 (2d Cir. 1986)); *accord MacDraw, Inc. v. CIT Group Equip. Fin., Inc.,* 73 F.3d 1253, 1261 (2d Cir.1996).

■ The standards for imposing sanctions pursuant to the Court's inherent power are similar to the standards applicable to section 1927, with one major difference. Section 1927 applies only to attorneys, while a court may assess attorneys' fees against both attorneys and parties pursuant to its inherent power, for " 'act[ing] in bad faith, vexatiously, wantonly, or for oppressive reasons,' " *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) (citations omitted)), and for "misconduct during the course of litigation." *Milltex Indus. Corp. v. Jacquard Lace Co.,* 55 F.3d 34, 37–38 (2d Cir.1995).

■ The Second Circuit has repeatedly held that sanctions may not be awarded under section 1927 or a court's inherent powers unless the challenged actions are "motivated by 'improper purposes,' such as harassment or delay," and taken "entirely without color." *Id.* at 38 (citation omitted); *see Schlaifer Nance & Co. v. Estate of Warhol,* 194 F.3d 323 (2d Cir.1999). A claim is "colorable ... when it has some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Nemeroff v. Abelson,* 620 F.2d 339, 348 (2d Cir.1980). As the Second Circuit explained further in *Schlaifer Nance:*

A claim is colorable when it reasonably might be successful, while a claim lacks a colorable basis when it is utterly devoid of a legal or factual basis.

194 F.3d at 336 (vacating sanctions award because facts were sufficient to allow attorneys "reasonably to believe that they could have established their fraud claim").

### 2. *Application*

#### a. *Colorability*

Here, I believe Revson's claim of fraudulent overbilling was specious at best. Revson and Cinque worked closely together and she had a good sense of the time that he was devoting to her matters. The Firm provided her with detailed bills, time sheets, and other billing information, both orally and in writing. She was assisted by accountants and financial assistants, who reviewed the Firm's bills and records as well.

In the end, Revson's claim that she had been defrauded by Cinque came down to her allegation that Robert Cinque had overbilled her for his time charges during his trip to Florida, as Burstein argued in summation that Cinque had "lied" about his time charges in Florida, thereby committing "fraud" and "cheating" her. (Tr. 790). There was no legitimate basis for these accusations, however, as Cinque only billed for some twelve or thirteen hours of time for the several days in question, which included one full day of work, some work on parts of other days, and a review of documents on the flights back and forth

between New York and Florida. (Tr. at 628; *cf. id.* at 68). The overbilling claim makes no sense—it is highly improbable that Cinque would have tried to overbill her for a period of time when they were vacationing and working together in her Florida home.

Nonetheless, I cannot conclude that the fraud claim was "utterly devoid of a legal or factual basis," from Burstein's point of view, nor can I conclude that it was unreasonable for him to believe, at least at the outset of the case, that he "could" establish fraud. Burstein had a factual basis for alleging that Cinque had breached his obligations to Revson by threatening to "abandon" her: Revson told him so. Although the jury rejected this testimony, Burstein was entitled to accept Revson's version of the facts. In addition, Revson had the right to bring suit to recover her files without making any effort to settle and she surely had the right to defend against the Firm's counterclaims. Burstein had the right, indeed, the duty, to vigorously represent her in these respects. Hence, I conclude that Revson asserted at least some claims and defenses in this case that were "colorable."

The issue remains, however, whether sanctions may be imposed against Burstein even in the absence of a finding that Revson's claims and defenses were "entirely without color." In the context of Rule 11, the Second Circuit has addressed the issue of whether sanctions may be imposed for the filing of a "nonfrivolous," or colorable, complaint where the complaint was filed for an improper purpose. In *Sussman v. Bank of Israel,* 56 F.3d 450 (2d Cir.1995), the Court held, in the context of a case where the complaint was not only colorable but plaintiffs had obtained some relief in the district court:

> A party should not be penalized for or deterred from seeking and obtaining warranted judicial relief merely because one of his multiple purposes in seeking that relief may have been improper.

*Id.* at 459.

■ The instant case presents a different situation. My concern is not with whether Burstein asserted frivolous claims against the Firm. Rather, my concern is with the manner in which Burstein litigated the case and whether his conduct multiplied these proceedings and caused unnecessary injury to Cinque and the Firm. Hence, the analysis is necessarily different.

Courts have imposed sanctions for misconduct by a lawyer without a finding that the lawyer asserted a frivolous claim or defense.[9] Indeed, the existence of a colorable claim does not give a lawyer a license

9. *See, e.g., DLC Management Corp. v. Town of Hyde Park,* 163 F.3d 124, 135–36 (2d Cir. 1998) ("[F]ederal courts have 'well-acknowledged inherent power to levy sanctions in response to abusive litigation practices.' ... [T]his court has required a finding of bad faith ... shown by (1) 'clear evidence' or (2) 'harassment or delay or ... other improper purposes.' ") (citations omitted); *Apex Oil Co. v. Belcher Co.,* 855 F.2d 1009, 1019 (2d Cir. 1988) (affirming § 1927 sanctions for violation of local rule requiring good faith effort to settle without reference to absence of color); *Unique Concepts, Inc. v. Brown,* 115 F.R.D. 292, 293–94 (S.D.N.Y.1987) (sanctioning attorney $693.25 in costs and $250 fine for "harassing, wasteful, vexatious" conduct during a deposition, including "ad hominem attacks and long-winded interruptions"); *Blumberg v. Carol O'Neil & Assocs., Inc.,* N.Y.L.J., June 18, 1999, at 26 (Sup.Ct. N.Y.

Co. June 18, 1999) (sanctioning plaintiff's attorney $500 to be paid to client protection fund for making "veiled threat" to interfere with defendant's client if defendant did not "immediately settle" and making "insulting remark[s]" to defense counsel); *Principe v. Assay Partners,* 154 Misc.2d 702, 586 N.Y.S.2d 182, 187 (Sup.Ct.N.Y.Co.1992) (sanctioning attorney $500 to be paid to client protection fund and additional $500 to be paid to moving party in attorneys' fees for abusive comments during deposition, including telling opposing counsel to "go away little girl" and calling another individual who was present a "little mouse"); *see also Novak v. National Broadcasting Co.,* 779 F.Supp. 1428 (S.D.N.Y.1992) (sanctioning pro se plaintiffs $3,500 for making "unseemly and unfunny" references in their written submissions to defense counsel as "Laurel and Hardy").

to freely engage in abusive or improper conduct, and I hold that a lawyer may be sanctioned for abusive or improper *conduct*, even when he or she is pressing a colorable claim or defense on behalf of a client.

### b. *Bad Faith*

■ I turn to the question of whether Burstein acted in bad faith and engaged in conduct for improper purposes. I conclude that he did so, for four reasons: (1) he engaged in offensive, demeaning, and abusive conduct, (2) he engaged in conduct that was extortionate in nature, (3) he multiplied these proceedings, and (4) he acted with complete and utter disregard for the harm that his actions would cause Cinque and the Firm. I address each reason in turn, and I will also briefly address some additional arguments raised by Burstein.

### (1) *Burstein's Abusive Conduct*

Burstein engaged in offensive, demeaning, abusive, haranguing, and discourteous conduct.

The proctology letter speaks for itself, and even Burstein acknowledged that the letter was "improper, offensive, and should not have been sent as written" and he acknowledged further that he "went over the line" by writing it. (Burstein 7/15/99 Decl., Ex. HH).[10]

But there was more. Burstein repeatedly engaged in name-calling: he called Cinque "a lawyer who ... shames all of us in the profession," "a disgrace to the legal profession," and "slimy." He accused Cinque of being "professionally irresponsible" and so "desperate for money he resorted to ... extortion." He charged Cinque with "engag[ing] in the type of mail fraud that has led to the criminal conviction of other attorneys."

He pointed to Cinque's alleged conduct as an example of "why lawyers are sometimes referred to as snakes." By personalizing the dispute and engaging in these repeated offensive, ad hominem attacks, Burstein "[e]ngaged in conduct that is prejudicial to the administration of justice." Model Code DR 1–102; *see also In re Dinhofer*, 257 A.D.2d 326, 690 N.Y.S.2d 245 (1st Dep't 1999) (suspending attorney for saying to a judge, "[y]ou are corrupt and you stink"); *In re Kavanagh*, 189 A.D.2d 521, 597 N.Y.S.2d 24 (1st Dep't 1993) (disciplining attorney for violating DR 7–106(C)(6) by making insulting and degrading remarks to and about opposing counsel, including suggesting he was linked to organized crime).

Burstein also engaged in tactics at trial that were simply unfair and obnoxious, including cross-examining Cinque on the basis of criticism directed by Judge MacMahon at Cinque's firm when Cinque was fresh out of law school and could not have had anything to do with the issue in question, and also by forcing Cinque to choose between having his companion excluded from the courtroom as a potential witness or waiving his right to call her, and then, after Cinque chose the latter, asking the jury to draw an inference against Cinque because he did not call her as a witness.

### (2) *Burstein's Extortionate Conduct*

Burstein engaged in conduct that was extortionate in nature. Although it is certainly not improper to threaten to file a civil suit, he did much more than that. He threatened to "tarnish" Cinque's "reputation." He followed up on that threat by accusing Cinque of fraud and fraudulent overbilling, a claim that he was never able to support with any concrete evidence and that was based primarily on his misreading of the Firm's time sheets. He conducted

---

10. Burstein's acknowledgement that the proctology letter "went over the line" substantially undercuts the views of his expert on the "conduct of lawyers," Stuart A. Summit, Esq. Summit contends that the "proctology" letter was not inappropriate, opines that the letter was "more humorous than threatening," and states that his "first instinct would be to pass it around the office, so that everyone could enjoy the humor." (Summit Report, at 7).

an "independent investigation" to ascertain the identity of the Firm's *other* clients, actually contacted representatives of the Firm's former clients, and sought permission to send a letter to all the Firm's clients advising them of the lawsuit. He tried to subpoena all the Firm's banking records. He wrote a letter to Cinque threatening to send a letter to the Court accusing him of criminal conduct if he did not capitulate to Revson's demands. *See* Model Code DR 7–105 ("A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."). He threatened to turn a fee dispute into a RICO case. He actually tried to make good on his threat to "tarnish" Cinque's reputation by contacting at least one reporter, who indeed wrote an article about the case in which former clients of the Firm are quoted. *See Kramer v. Tribe,* 156 F.R.D. 96 (D.N.J.1994) (disciplining attorney who sued another attorney for share of a fee, where plaintiff attorney threatened to "ruin" reputation of defendant attorney and sought to carry out that threat by distributing complaint to media and other members of legal community).

Burstein relies heavily on *Sussman v. Bank of Israel,* 56 F.3d 450, 453, 459 (2d Cir.1995), where the Second Circuit held that a "prelitigation" letter threatening suit and a "full airing" of "outrageous conduct" if the matter were not resolved did not show an improper purpose. *Sussman* is distinguishable, however, for the prelitigation letter there did not contain the kind of offensive and inappropriate language used by Burstein in this case. Burstein's choice of words, as well as his filing of suit even after Cinque expressed a willingness to discuss settlement, shows that the proctology letter was sent in bad faith. More-

over, I am not sanctioning Burstein on the basis of the proctology letter alone. Rather, the letter was but one in a series of inappropriate acts.

As Judge Miner has observed in discussing civility, "the purpose of our enterprise is justice under the law and ... anything that moves us away from that purpose ... is to be condemned." Roger J. Miner, *Professional Responsibility in Appellate Practice: A View From the Bench,* 19 Pace L.Rev. 323, 331 (1999). Conduct that is intended not to reach the truth but to coerce a settlement through improper threats and harassment does not further our purpose of seeking justice.

### (3) *Burstein Multiplied These Proceedings*

Burstein's actions multiplied these proceedings. He placed Cinque in a position where Cinque had no choice but to litigate, for the only way that Cinque could obtain vindication with respect to the allegations of fraud was to try the case and obtain a finding that he had not engaged in fraud.[11] Although Burstein contends now that Revson was interested in settling the case, his first offer to discuss settlement was a sham and betrays his bad faith. When Cinque met Burstein's unreasonable deadline by expressing an interest in discussing settlement, Burstein ignored him and responded by filing suit. His June 22, 1998 letter to Cinque also purported to express a desire to settle, but in the process the letter set an unreasonable deadline for Cinque to respond, demanded that the Firm agree to all the relief that Revson could obtain if she had prevailed in every respect at trial, and called Cinque "a lawyer who ... shames all of us in the profession." (Cinque Decl., Ex. Q).

---

**11.** At the August 25, 1999 hearing, Burstein seemed to acknowledge that Cinque had little choice but to take the case to trial:

> Your Honor issued this order out of concern for the damage that I may have done ... to Mr. Cinque and you quoted his statement about his reputation and things of

that nature. Those same concerns are equally applicable to me, but the difference is Mr. Cinque has a remedy. Mr. Cinque's remedy was to come into court, to defend against those charges and ... actually get a significant judgment in his favor.

(8/25/99 Tr. at 40).

These were not good faith efforts to settle. Instead, Burstein's actions escalated what should have been a simple fee dispute into a bitter, costly, time-consuming, and unseemly litigation. His proctology letter obviously placed a great burden on everyone, was the subject of a motion *in limine,* and was discussed at length throughout the trial. His subpoenas to the bank and efforts to contact the Firm's former clients generated disputes that repeatedly required the intervention of the Court. Finally, his actions certainly led to the expenditure of a great deal of effort on the issue of sanctions.

### (4) *Burstein's Disregard for the Harm to Cinque and the Firm*

Finally, Burstein acted with complete and utter disregard for the harm that his actions would cause Cinque and the Firm. After warning Cinque that his reputation would be "tarnish[ed]" and purportedly inviting settlement discussions to give Cinque the opportunity to prevent that from happening, Burstein ignored Cinque's acceptance of that invitation and instead simply filed suit. He asserted a claim of fraudulent overbilling essentially on speculation, and then fished for evidence to support that claim by seeking to identify and contact other clients of the Firm and subpoenaing bank records.

It is apparent that Burstein gave no consideration to the impact that the public accusations of fraud or the efforts to identify and contact the Firm's other clients or the personal slurs and attacks would have on Cinque or that, even worse, he intentionally conducted himself in a manner calculated to create that impact.

### (5) *Burstein's Additional Arguments*

Burstein makes four additional arguments that I will briefly address.

First, he contends that he acted in the manner that he did because of his perception, prior to filing suit, that Cinque was "extraordinarily rude and unreasonable." (Burstein 7/15/99 Decl. ¶ 29). The contention is rejected, for I do not believe that Burstein engaged in his tactics in this case merely because of Cinque's purported reputation. He had never met or spoken to Cinque prior to this lawsuit. In addition, Cinque always conducted himself in a respectful and civil manner in this case and he never responded to Burstein in kind. Indeed, Cinque handled these extraordinarily difficult circumstances with great dignity. Finally, even assuming that Burstein did believe that Cinque could be rude and unreasonable, "two wrongs don't make a right," and that belief did not give Burstein justification to engage in offensive, demeaning behavior himself.

Second, Burstein argues that he ought not to be sanctioned because the Court failed to give him "contemporaneous guidance" that his actions were reaching a "critical mass." (Burstein 8/22/99 Decl. ¶ 3). Burstein is wrong. I did make my views known along the way,[12] and I did not learn of other incidents until much later. More importantly, I am sanctioning Burstein not for one single incident, but for his entire course of conduct. To say that the Court must view each individual incident along the way with an eye toward whether it fits into a course of conduct that in totality is sanctionable in the end speaks volumes about Burstein's attitude toward the administration of justice. The view is that litigation is not just a war with the opposing party or counsel, but also a contest with the Court. It is an attitude that asks: "how much can I get away with this time, and if the Court lets me get away with it, can I throw it back at the Court later?" I expect more from an officer of the Court, and I certainly expect more

---

**12.** Early on I told his partner my views on the proctology letter; on numerous occasions (both before and during trial) I told both sides that there was too much emotion in the case; I twice quashed Burstein's subpoenas; and I expressed my views again, more formally, in my decision on the motion *in limine.*

from Burstein, who is a very capable, experienced attorney.

Burstein's counsel argues in this vein that when I denied the Firm's requests for sanctions upon quashing the bank subpoenas I sent a "signal" that the conduct was not "sanctionable." (8/25/99 Tr. at 63–64). By this logic, if I were to decline to sanction Burstein in this case, I would be sending a "signal" to the bar that it is appropriate to write offensive, threatening letters to a party, that it is permissible to call adversaries "snakes" and "slimy," and that lawyers can engage in vexatious, unfair tactics with impunity. I will not send that "signal."

Third, Burstein suggests that I am overly sensitive and that, in essence, attorneys are held to a higher standard in terms of civility in my courtroom than in others. (*See* Burstein 7/15/99 Decl., Ex. EE; 5/19/99 Burstein Letter to the Court). I do not believe that to be the case. I cannot imagine that Burstein's course of conduct in this case would be tolerated by any judge. Standards of conduct do not shift from courtroom to courtroom; a lawyer is an officer of the court who must act in a respectful and responsible manner—not to please a particular judge but because that is the right way to act.

Finally, Burstein argues that he was only meeting his obligation to act zealously. But that is not so, and it is apparent that Burstein does not fully understand his ethical obligations. At the August 25, 1999 hearing, Burstein stated that he was "commanded to act as a zealot." (8/25/99 Tr. at 30). He is wrong. Although an attorney must represent his client zealously, he cannot be a "zealot." *Minnesota v. Richardson,* 514 N.W.2d 573, 576 (Minn.Ct.App. 1994) ("An attorney at trial is an advocate and, as an officer of the court, cannot be a zealot."); George A. Riemer, *Zealous Lawyers: Saints or Sinners,* 59 Or. St. B. Bull. 31 (Oct.1998) ("As an officer of the court, however, a trial lawyer cannot be a zealot.").

Judge Marvin E. Aspen, Chief Judge of the United States District Court for the Northern District of Illinois, has addressed the issue of a lawyer's duty to represent a client zealously in this context:

> Some trial lawyers ... would argue that the duty to represent a client zealously is paramount to the administration of justice, even when it conflicts with any obligations of professionalism. That, in essence, forms the core of the debate over the decline of civility in the profession. The Rambo lawyers invariably wrap their tactics and abrasive style in the cloak of zealous advocacy. To do less, they maintain, is to fail to put the interests of their client first....
>
> I can tell them that not only do they not understand the law, but the fact that judges [and jurors] who witness their tirades are merely human makes those tactics doubly dangerous.

Marvin E. Aspen, *Let Us Be "Officers of the Court,"* 83 A.B.A. J. 94 (1997).

For all these reasons, Burstein's arguments are rejected and sanctions will be imposed against him.

### 3. *The Amount of Sanctions*

 The Firm expended approximately $270,000 worth of time litigating the case on the merits and another approximately $25,000 in time addressing the issue of sanctions. Because of Burstein's conduct, the Firm is entitled to be compensated for a portion of its time spent on this case. The Firm did not actually pay attorneys' fees, but it could have spent the time on other matters earning a fee.

Of course, the Firm is not entitled to be compensated for all of its time. As I have held, Revson had some colorable claims and she was certainly entitled to defend against the Firm's counterclaims. The Firm is not entitled to compensation for its time spent defending against colorable claims or prosecuting its counterclaims.

Nonetheless, I have no doubt that Burstein's tactics multiplied these proceedings

in the sense that the Firm (and, for that matter, Revson) would have spent substantially less time on the case if Burstein had conducted himself in an appropriate manner. Indeed, Burstein's tactics significantly reduced the possibility of a settlement, as he left Cinque with little choice but to take the case to verdict. It is worth noting that after Burstein replaced Cinque as Revson's attorney, Burstein's firm received in excess of $1 million in fees in approximately the first year of representing her.

For all these reasons, I will impose sanctions against Burstein in the amount of $50,000.

### CONCLUSION

Sanctions are imposed on Burstein. He is ordered to pay $50,000 to the Firm. Sanctions are not imposed on Revson. She is, however, ordered to pay costs of $3,279.42 to the Firm.

The Clerk of the Court shall enter a supplemental judgment accordingly.